IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

GEORGE THOMAS LEAVER          )
                              )
v.                            )          No. 3:12-0150
                              )
CAROLYN W. COLVIN,            )
    Acting Commissioner of        )
    Social Security[1]            )


To: The Honorable John T. Nixon, Senior District Judge


## REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the plaintiff's claim for Disability Insurance Benefits ("DIB"), as provided by the Social Security Act.

Upon review of the Administrative Record as a whole, the Court finds that the Commissioner's determination that the plaintiff is not disabled under the Act is supported by substantial evidence in the record as required by 42 U.S.C. § 405(g), and that the plaintiff's motion for judgment on the administrative record (Docket Entry No. 13) should be DENIED.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for former Commissioner Michael J. Astrue as the defendant in this case.

# I. INTRODUCTION

On July 13, 2009, the plaintiff protectively filed for DIB, alleging a disability onset date of August 29, 2008, due to a "[c]rushed right foot," which rendered him unable to climb ladders, stand for long periods of time, or maintain balance. (Tr. 67, 71, 106-12, 124, 129.) His application was denied initially and upon reconsideration. (Tr. 61-63, 80-82, 87-88.) The plaintiff appealed and later added allegations of back pain, hip pain, and symptoms of depression. (Tr. 71, 146-53.) On June 9, 2010, the plaintiff appeared and testified at a hearing before Administrative Law Judge Scott Shimer ("ALJ"). (Tr. 11-39.) The ALJ entered an unfavorable decision on July 26, 2011. (Tr. 67-76.) On December 2, 2011, the Appeals Council denied the plaintiff's request for review, thereby making the ALJ's decision the final decision of the Commissioner. (Tr. 1-3.)

# II. BACKGROUND

The plaintiff was born on July 18, 1968, and he was 40 years old as of his alleged disability onset date. (Tr. 19.) He attended school through the tenth grade and has worked as an aluminum anodizer, electrician's helper, door hanger, and boat assembler. (Tr. 16-18, 33-34.)

## A. Chronological Background: Procedural Developments and Medical Records

In 1999, while the plaintiff was working as a door hanger, a large industrial garage door fell on his right forefoot, fracturing all five toes and crushing the soft tissue in his foot. (Tr. 209-10.) Following a trip to the emergency room, he underwent surgery for soft tissue debridement and fixation of pins in each of the fractured toes. (Tr. 209-16.)

The record does not contain any further medical records until February 2006, when the plaintiff presented to Dr. W. Blake Garside at the Tennessee Orthopaedic Alliance with complaints of "increasing pain and discomfort in his right forefoot." (Tr. 190.) Dr. Garside noted that the plaintiff had returned for treatment after "a several year absence." *Id.* The plaintiff described having a "shooting type sensation between the toes" that was "worse with ambulation," and he reported that he had not been wearing prescribed orthotics for the past year. *Id.* During a physical examination, Dr. Garside observed that the plaintiff walked with a normal heel-toe gait and had "no appreciable swelling" but had decreased range of motion in his toes, minimal "tender[ness] to palpation in the right 2nd interdigital space," "[n]o active or passive motion at his great toe IP joint," and "pain with forefoot compression." *Id.* X-rays showed no acute fractures or dislocations with well maintained joint spaces. *Id.* In addition to the plaintiff's status post right foot crush injury, Dr. Garside diagnosed him with an "acute aggravation of his [right] 2nd interdigital neuroma," injected the foot with Depo-Medrol, Lidocaine, and Marcaine,[2] and prescribed custom orthotics. *Id.*

The plaintiff was also treated by Dr. Raul Couret, Jr., beginning in September 2006.[3] (Tr. 166-74, 195-201.) In January 2007, the plaintiff presented with back pain and muscle spasms.[4] (Tr. 170.) In April 2008, he reported that he had "pulled something" in his back, but, at the time of

---

[2] Depo-Medrol is used as a corticosteroid and anti-inflammatory, and Lidocaine and Marcaine are local anesthetics. Saunders Pharmaceutical Word Book 210, 406, 426 (2009) ("Saunders").

[3] The Court made every attempt to decipher the medical evidence of record; however, some of Dr. Couret's handwritten treatment notes are illegible.

[4] The plaintiff contends that Dr. Couret attributed his back pain and muscle spasms to "stress put on him by his right foot crush injury." Docket Entry No. 13-1, at 5; (tr. 170). While it appears that Dr. Couret connected the plaintiff's back pain to his foot injury, the Court cannot precisely determine Dr. Couret's conclusion because his handwriting is illegible.

the visit, he did not have back pain and demonstrated normal range of motion. (Tr. 168.) He also reported having pain in his left knee and left hip, but an x-ray of his left hip was normal. (Tr. 168, 173.) In September 2008, he presented with right knee pain and swelling, and an x-ray showed "[s]mall joint effusion." (Tr. 167, 172.)

The plaintiff returned to Dr. Garside in July 2009 with "intermittent pain and discomfort" in his foot, and Dr. Garside again noted that he had not seen the plaintiff in over three and a half years. (Tr. 188.) The plaintiff reported that his pain was "worse with activities" and accompanied by intermittent swelling. *Id.* He explained that some days he was "unable to bear weight or put his shoes on because of pain" but acknowledged that he had not been wearing orthotics as prescribed. *Id.* During a physical examination, he had a normal heel-toe walk but was tender to palpation over "the dorsal aspect of his right foot [and] . . . plantar metatarsal heads with decreased range of motion of his toes on flexion." *Id.* X-rays showed no evidence of acute fracture or dislocations and well-maintained joint spaces. *Id.* Dr. Garside continued to recommend that he use custom orthotics. *Id.*

On October 7, 2009, Dr. Albert Gomez, a Tennessee Disability Determination Services ("DDS") consultative physician, physically examined the plaintiff. (Tr. 175-78.) The plaintiff described his right knee and right foot pain as "aching type, severe and constant without radiation, and increased with any standing or walking," but he related that his symptoms decreased with rest and pain medications. (Tr. 175.) Dr. Gomez observed that the plaintiff "walk[ed] with a limp without any walking devices" but was able to get "on and off the exam table without difficulty." (Tr. 176.) During the examination, the plaintiff demonstrated full range of motion in his back, shoulders, hips, elbows, wrists, and ankles. *Id.* He had mild edema and moderate tenderness to palpation in his right knee with flexion at 120 degrees and normal extension. *Id.* He had moderate

tenderness to palpation in the anterior portion of his foot but no edema. *Id.* He demonstrated good handgrip bilaterally, normal fist making and pinch grip, normal fine finger movements and extension, and 5/5 motor strength in both upper and lower extremities. *Id.* He was able to perform straight leg raises in both the lying and sitting positions as well as perform the tandem walk and heel walk. *Id.* He could stand on one leg normally but could not walk on his toes or perform a squat. *Id.* Dr. Gomez diagnosed him with chronic knee pain and chronic foot pain, and he opined that, during an eight-hour workday, the plaintiff could occasionally lift 20-30 pounds and stand or sit at least six hours with normal breaks. (Tr. 176-77.)

On October 30, 2009, K. Steinhardt,[5] a nonexamining DDS medical consultant, completed a physical Residual Functional Capacity ("RFC") assessment. (Tr. 179-86.) The consultant opined that the plaintiff was able to lift and/or carry twenty pounds occasionally and ten pounds frequently, stand and/or walk about six hours in an eight-hour workday, sit about six hours in an eight-hour workday, push and/or pull without limitations, frequently stoop, and frequently climb ramps and stairs. (Tr. 180-81.) The consultant also opined that the plaintiff could occasionally balance, kneel, crouch, crawl, and climb ladders, ropes, and scaffolds.[6] (Tr. 181.)

In November 2009, Dr. Couret diagnosed the plaintiff with low back pain, degenerative disc disease, and right knee pain with effusion. (Tr. 201.) In March 2010, the plaintiff reported that he was sleeping 3-4 hours a night and was "sad [and] depress[ed] a lot." (Tr. 198.) Dr. Couret

---

[5] K. Steinhardt did not indicate his or her professional license or qualifications on the RFC assessment. (Tr. 186.)

[6] On February 4, 2010, Dr. Susan Warner, a nonexamining DDS consultative physician, "affirmed" K. Steinhardt's assessment. (Tr. 192.)

diagnosed him with fatigue/malaise, obesity, right knee pain with effusion, right foot crush injury, and depression. (Tr. 196, 200.)

The plaintiff returned to Dr. Garside in March 2010 with complaints of right knee pain and depression. (Tr. 193-94.) Dr. Garside noted that he had undergone "right knee arthroscopy in September of 2008 with chondroplasty and removal of several loose bodies."[7] (Tr. 193.) The plaintiff used a cane and walked with an antalgic gait, but he had no hip or back pain and full range of motion in his hips with a stable pelvis. *Id.* His right knee had intact sensation but moderate effusion and pain with patellar compression and quadriceps resistance testing. *Id.* Dr. Garside diagnosed "[r]ight knee patellofemoral chondromalacia" and injected the knee with Depo-Medrol, Lidocaine, and Marcaine. *Id.*

On January 12, 2011, the plaintiff presented to Dr. Couret with right knee pain, joint pain, swelling, back pain, and leg weakness. (Tr. 195.) Dr. Couret completed a Medical Source Statement assessing the plaintiff's physical ability to do work-related activities. (Tr. 202-07.) He opined that the plaintiff could frequently lift up to twenty pounds, occasionally lift up to fifty pounds, and occasionally carry up to twenty pounds. (Tr. 202.) He opined that in an eight hour workday the plaintiff could sit for four hours, stand for less than one hour, and walk for thirty minutes. (Tr. 203.) Dr. Couret found that the plaintiff required a cane to ambulate for stability and to take weight off his right foot and that the plaintiff could frequently reach overhead, occasionally reach in all other directions, occasionally push and/or pull, and frequently handle, finger, and feel. (Tr. 203-04.) He explained that the plaintiff's difficulties reaching and pushing were due to his placing weight on his right foot. *Id.* Dr. Couret opined that the plaintiff could never operate foot controls with his right

---

[7] Medical records from this surgery are not in the record before the Court.

foot, but could do so frequently with his left foot, and that he could never perform postural activities such as balancing, stooping, kneeling, crouching, crawling, or climbing stairs, ramps, ladders, and scaffolds. (Tr. 205.) He opined that the plaintiff could never be around unprotected heights or moving mechanical parts; could occasionally operate a motor vehicle and be exposed to vibrations; could frequently be exposed to extreme cold; and could be exposed to only moderate noise. (Tr. 206.) Finally, Dr. Couret opined that the plaintiff could never walk a block at a reasonable pace on rough or uneven surfaces but was able to shop, travel without a companion, use standard public transportation, climb a few steps at a reasonable pace with the use of a single hand rail, prepare a simple meal, feed himself, care for his personal hygiene, and sort, handle, or use papers and files. (Tr. 207.)

### B. Hearing Testimony

At the hearing on June 9, 2010, the plaintiff was represented by counsel, and the plaintiff and Gail Ditmore, a vocational expert ("VE"), testified. (Tr. 11-39.) The plaintiff testified that he lives with his wife and that he attended school through the tenth grade while taking special education classes. (Tr. 16, 19.) He testified that he is able to read, count change, and perform "general math." (Tr. 16.) He testified that he has a driver's license and is able to drive but can only drive a vehicle with an automatic transmission because he can only operate foot pedals with his left foot. (Tr. 19-20.) He testified that he is 5'11" tall and weighs 240 pounds but said that his usual weight is between 180-200 pounds. (Tr. 26.)

The plaintiff related that he worked as an aluminum anodizer, electrician's helper, door hanger, and boat assembler. (Tr. 17-18.) He explained that when he worked as an electrician's

helper, the electrician was his best friend and allowed him to miss work approximately 3-4 days per month. (Tr. 20-21.) He testified that his right foot was "crushed" from his ankle to his toes after a 750 pound steel door fell on it during a workplace accident. (Tr. 20, 22-23.) He said that the foot injury causes "shooting" pain in his left hip and leg and that he believes he has carpal tunnel syndrome. (Tr. 23, 25.) He explained that his pain has necessitated using a cane on a daily basis, which he carries in his left, non-dominant hand. (Tr. 23, 31.) He related that he has rheumatoid arthritis in his right knee, explaining that, "[i]t stays swollen constantly. Getting up and down it bothers me. Going up and down the steps, it's unbelievable." (Tr. 24, 26.) He also testified that he has a "deteriorating disc" in his spine that causes back pain on the right side around his hip. (Tr. 25-26.) The plaintiff testified that he has symptoms of depression including "soft heartedness," crying spells, moodiness, difficulty concentrating, not wanting to go out or be around people, and "feel[ing] like everything is going wrong with [him]." (Tr. 26-27.) He explained that he sometimes forgets what he is reading, forgets his doctor's name, and has difficulty "keeping up" with television shows. (Tr. 27.)

He testified that his depression has led to arguments with his wife over him not being able to help around the house. (Tr. 27-28.) He said that he could lift a gallon of milk but nothing heavier, stand for 15-20 minutes at a time or 45-60 minutes total during an eight-hour workday, sit for 10-15 minutes at a time or about an hour total during an eight-hour workday, and walk approximately 50-100 feet with his cane or twenty feet without his cane. (Tr. 28-29.) He said that if a coin were on the floor, he could bend over or kneel down and pick it up but that "it would take [him] a while." (Tr. 29-30.) He added that he would not be able to squat down and pick it up. *Id.*

The VE classified the plaintiff's past job as an aluminum anodizer as heavy, unskilled work; his past job as an electrician's helper as very heavy, unskilled work; his past job as a door hanger as very heavy, semi-skilled work; and his past job as a boat assembler as heavy, skilled work.[8] (Tr. 33-34.)

The ALJ asked the VE whether a hypothetical person with the plaintiff's age, education, and work experience would be able to obtain work if he were able to perform work at the light exertional level; could not push or pull with his right lower extremity, could occasionally balance, kneel, and crawl; could not climb ropes, ladders, or scaffolding; could not crouch; could occasionally climb ramps and stairs; needed a cane for ambulation that he held in his left, non-dominant hand; needed a sit-stand option at will throughout an eight-hour workday; could not work around hazardous moving machinery or dangerous unprotected heights; could occasionally come in contact with the public; and could only perform simple, routine, repetitive tasks. (Tr. 34.) The VE replied that such a person could work in jobs at the light exertional level such as assembler, production worker, and inspector. (Tr. 35.)

Next, the ALJ asked whether there would still be jobs available if a person with these limitations were further limited to only sedentary work. *Id.* The VE replied that such a person could work at sedentary, unskilled positions as an assembler, production worker, and inspector. (Tr. 36.) Finally, the ALJ asked whether someone with the limitations identified in Dr. Couret's Medical Source Statement could perform any jobs, and the VE replied that Dr. Couret's opinion precluded full-time work. *Id.* In response to questioning by the plaintiff's attorney, the VE testified that a

---

[8] The VE testified that some of these job classifications differed from those provided in the Dictionary of Occupational Titles. (Tr. 33-34.)

person who consistently missed 3-4 days of work per month would not be able maintain employment. (Tr. 37.)

## III. THE ALJ'S FINDINGS

The ALJ issued an unfavorable ruling on July 26, 2011. (Tr. 67-76.) Based upon the record, the ALJ made the following findings:

1.     The claimant last met the insured status requirements of the Social Security Act on March 31, 2011.

2.     The claimant did not engage in substantial gainful activity during the period from his alleged onset date of August 29, 2008 through his date last insured of March 31, 2011 (20 CFR 404.1571 *et seq.*).

3.     Through the date last insured, the claimant had the following severe impairments: right knee patellofemoral chondromalacia, obesity, residuals of right foot crush injury, degenerative disc disease and depression (20 CFR 404.1520(c)).

4.     Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

\*\*\*

5.     After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) in that he can lift 20 pounds occasionally and ten pounds frequently. He cannot push or pull with his right lower extremity. He can only occasionally balance, kneel, crawl and climb ramps and stairs. He cannot crouch or climb ladders, ropes or scaffolds. He may need a cane to ambulate that is held in the left, non-dominant hand, and he needs to be able to sit or stand at will throughout an eight-hour workday. He can do no work around hazardous moving machinery or dangerous unprotected heights. He is limited to simple, routine, repetitive tasks and can have only occasional contact with the public.

\*\*\*

10

6.      Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

                                    ***

7.      The claimant was born on July 18, 1968 and was 42 years old, which is defined as a younger individual age 18-49, on the date last insured (20 CFR 404.1563).

8.      The claimant has a limited education and is able to communicate in English (20 CFR 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Through the dated [*sic*] last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

                                    ***

11.     The claimant was not under a disability, as defined in the Social Security Act, at any time from August 29, 2008, the alleged onset date, through March 31, 2011, the date last insured (20 CFR 404.1520(g)).

(Tr. 69-75.)


# IV. DISCUSSION

## A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching her conclusion. 42 U.S.C. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420

(1971) (adopting and defining substantial evidence standard in context of Social Security cases); *Kyle v. Comm'r Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010). The Commissioner's decision must be affirmed if it is supported by substantial evidence, "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakely v. Comm'r of Soc. Sec.,* 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)); *Jones v. Comm'r of Soc. Sec.,* 336 F.3d 469, 477 (6th Cir. 2003); *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206 (1938)); *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).

A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs*., 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory

diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that he is not engaged in "substantial gainful activity" at the time he seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b), 416.920(b)); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that he suffers from a severe impairment that meets the twelve month durational requirement. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). *See also Edwards v. Comm'r of Soc. Sec.*, 113 Fed. Appx. 83, 85 (6th Cir. 2004). A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Barnhart v. Thomas*, 540 U.S. 20, 24, 124 S. Ct. 376 (2003) (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the plaintiff is presumed disabled

without further inquiry, regardless of age, education or work experience. *Id.* (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)). The plaintiff may establish that he meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent him from doing his past relevant work, he is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Cruse*, 502 F.3d at 539; *Jones*, 336 F.3d at 474 ("Through step four, the [plaintiff] bears the burden of proving the existence and severity of limitations caused by [his] impairments and the fact that [he] is precluded from performing [his] past relevant work"); *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, he must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that he is unable to perform his past relevant employment, the burden of production shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment and that such employment exists in significant numbers in the national economy. 20 C.F.R. § 404.1512(g); 68 Fed. Reg. 51153, 51154-55 (Aug. 6, 2003). *See also Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997)). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *Longworth*, 402 F.3d at 595. *See also Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d

524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S. Ct. 2428 (1983) (upholding the validity of the medical-vocational guidelines grid as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of his functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent him from doing his past relevant work, if other work exists in significant numbers in the national economy that the plaintiff can perform, he is not disabled. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). *See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of a plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

### B. The Five-Step Inquiry

In this case, the ALJ resolved the plaintiff's claim at step five of the five-step process. At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity during the period from his alleged onset date through his date last insured. (Tr. 69.) At step two, the ALJ determined that the plaintiff had the following severe impairments: "right knee patellofemoral chondromalacia, obesity, residuals of right foot crush injury, degenerative disc disease and depression." *Id.* At step three, the ALJ found that the plaintiff's impairments, either singly or in combination, did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404,

Subpart P, Appendix 1. (Tr. 69-70.) At step four, the ALJ determined that the plaintiff was unable to perform his past relevant work. (Tr. 74.) At step five, the ALJ found that the plaintiff could perform work at the light exertional level as an assembler, general production worker, and inspector. (Tr. 74-75.)

### C. The Plaintiff's Assertions of Error

The plaintiff contends that the ALJ erred by: (1) not giving controlling weight to Dr. Couret's opinion; (2) improperly assessing the plaintiff's subjective complaints of symptoms; and (3) finding that the plaintiff has the RFC to perform light work. Docket Entry No. 13-1, at 1, 10-17.

### 1. The ALJ did not commit reversible error in assessing Dr. Couret's opinion.

The plaintiff argues that the ALJ erred by not giving controlling weight to Dr. Couret's opinion. Docket Entry No. 13-1, at 10-14.

The Regulations provide that the SSA "will evaluate every medical opinion" that it receives. 20 C.F.R. § 404.1527(c). However, every medical opinion is not treated equally, and the Regulations describe three classifications for acceptable medical opinions: (1) nonexamining sources; (2) nontreating sources; and (3) treating sources. A nonexamining source is "a physician, psychologist, or other acceptable medical source[9] who has not examined [the claimant] but provides a medical or other opinion in [the claimant's] case." 20 C.F.R. §§ 404.1502, 416.902. A nontreating source is described as "a physician, psychologist, or other acceptable medical source who has

---

[9] The Regulations define acceptable medical sources as licensed physicians, both medical and osteopathic doctors, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. 20 C.F.R. § 404.1513(a).

examined [the claimant] but does not have, or did not have, an ongoing treatment relationship with [the claimant]." *Id.* Finally, the Regulations define a treating source as "[the claimant's] own physician, psychologist, or other acceptable medical source who provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." *Id.* An "ongoing treatment relationship" is a relationship with an "acceptable medical source when the medical evidence establishes that [the claimant] see[s], or [has] seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the claimant's] medical condition(s)." *Id.*

Generally, an ALJ is required to give "controlling weight" to the medical opinion of a treating source, as compared to the medical opinion of a non-treating source, if the opinion of the treating source is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2).[10] *See also Tilley v. Comm'r of Soc. Sec.*, 394 Fed. Appx. 216, 222 (6th Cir. 2010); *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009). This is commonly known as the treating physician rule. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); Soc. Sec. Rul. 96-2p, 1996 WL 374188 (July 2, 1996).

Even if a treating source's medical opinion is not given controlling weight, it is "'still entitled to deference and *must be weighed using all of the factors provided in [20 C.F.R. 416.927] . . . .*'"

---

[10] Effective March 26, 2012, the numbering for the treating physician rules changed. Section 416.927(d)(2) became section 416.927(c)(2), and the identically worded and interpreted section 404.1527(d)(2) became section 404.1527(c)(2). *See Johnson-Hunt v. Comm'r of Soc. Sec.*, 2012 WL 4039752, at *6 n.6 (6th Cir. Sept. 14, 2012).

*Fisk v. Astrue*, 253 Fed. Appx. 580, 585 (6th Cir. 2007) (quoting Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *4) (emphasis in original).   The ALJ must consider:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion with respect to relevant evidence such as medical signs and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the physician rendering the opinion; and (6) any other factor raised by the applicant.

*Meece v. Barnhart*, 192 Fed. Appx. 456, 461 (6th Cir. 2006) (quoting current 20 C.F.R. § 404.1527(c)(2)-(6)).   The ALJ must also provide "good reasons" for the resulting weight given to the treating source.   Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5 (citing current 20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2)).   The "good reasons" must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."   *Id.*   If an ALJ fails to adhere to this procedural requirement, the case should be remanded for further clarification.[11]   *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544-45 (6th Cir. 2004).

Dr. Couret treated the plaintiff from September 2006 until January 2011 for symptoms related to his foot crush injury, back pain and muscle spasms, hip pain, knee pain and swelling, leg weakness, fatigue, obesity, and depression.   (Tr. 167-74, 195-201.)   In January 2011, he completed a Medical Source Statement opining that the plaintiff could not work a full eight-hour workday. (Tr. 202-07.)   The ALJ discussed Dr. Couret's opinion as follows:

---

[11] The rationale for the "good reasons" requirement is to provide the claimant with a better understanding of the reasoning behind the decision in his case and to ensure that the ALJ properly applied the treating physician rule.   *Wilson*, 378 F.3d at 544 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)).

The claimant's primary care physician provided a medical source statement evaluating the claimant's ability to function in a work situation. He opined that the claimant could lift 20-50 pounds, significantly more than the limitations given in the RFC. However, he also opined that the claimant could only stand for less than one and a half miles[12] in an eight-hour day, and could sit for only four. He concluded that the claimant could frequently reach overhead, handle, finger and feel, but could only occasionally reach in all other directions and push/pull. There is no allegation in the record, or evidence to support any limitations in his upper extremities. The doctor opined that the claimant would have problems using his hands for reaching and pushing. The only allegation from claimant regarding his upper extremities is that he might have carpal tunnel syndrome. However, there is no diagnosis to support that allegation. There are no imaging studies to support that allegation. The physician opined that the claimant could only be around a moderate noise level, but there is no explanation for that limitation and no evidence of any condition that would require it. The treating physician opined that the claimant could never climb, balance, stoop, kneel, crouch or crawl. The undersigned finds the severity of these restrictions unsupported. The claimant said that climbing was difficult, but not impossible, so the undersigned gave a limitation of only occasional climbing of ramps and stairs. There is no support for the four hour sitting limitation, but the undersigned, giving the claimant the benefit of the doubt, allowed for a sit/stand at will option. The evaluation allows for only frequent use of the left foot, but there is no diagnosis suggesting any condition that would limit use of the left foot. The claimant uses his left foot to drive. The limitation of never stooping is overly restrictive in light of the fact that the claimant can drive and sit in a chair, as he did at the hearing, without problems of getting up or down or in and out. He obviously had to stoop to accomplish those tasks. This evaluation of a treating physician is considered in the RFC, but is given only limited weight for the reasons discussed above.

(Tr. 73.)

The plaintiff raises two issues with the ALJ's decision to give Dr. Couret's opinion limited weight rather than controlling weight. First, the plaintiff argues that the ALJ erred in finding that there was no support in the record for Dr. Couret's opinion that he would have occasional difficulty using his upper extremities for reaching and pushing. Docket Entry No. 13-1, at 12-13. Specifically,

---

[12] Presumably, the ALJ meant one and a half hours. It appears to the Court, however, that Dr. Couret opined that the plaintiff could stand for less than one hour in an eight-hour workday. (Tr. 203.)

the plaintiff points out that Dr. Couret did not find that the plaintiff would have problems with his hands themselves, but rather that he would have problems reaching, pushing, and pulling because these actions would cause him to distribute his body weight onto his crushed right foot. *Id.*; (tr. 204).

The Court agrees with the plaintiff that the ALJ's explanation for discrediting Dr. Couret's opinion regarding the plaintiff's ability to use his upper extremities for reaching, pushing, and pulling does not squarely address the basis for Dr. Couret's opinion. The ALJ specifically focused on the lack of a diagnosis or imaging studies to support a finding that the plaintiff had carpal tunnel syndrome. However, the ALJ did not address Dr. Couret's explanation that the plaintiff's difficulty reaching, pushing, and pulling stemmed from the distribution of his body weight onto his crushed right foot while doing so. Consequently, while the ALJ is correct that the record does not support a finding that the plaintiff has carpal tunnel syndrome or any limitations specific to his upper extremities, the ALJ's explanation is lacking because it does not specifically address Dr. Couret's rationale for finding upper extremity limitations.

The Court is not persuaded, however, that the ALJ's failure to specifically address Dr. Couret's rationale is reversible error. As the ALJ indicated more generally, "[t]here is no allegation in the record, or evidence to support any limitations in [the plaintiff's] upper extremities." (Tr. 73.) Even accepting Dr. Couret's explanation at face value, there is nothing in the record to support his conclusion that the plaintiff's abilities to reach, push, or pull are affected in any way by his foot injury. The plaintiff never alleged such limitations, and Dr. Couret's treatment notes are devoid of any indication that the plaintiff has upper extremity limitations.[13] (Tr. 167-74, 195-201.)

_____

[13] The Court acknowledges the plaintiff's contention that, in January 2007, Dr. Couret attributed the plaintiff's back pain and muscle spasms to "stress put on him by his right foot crush injury." *See* n.4 *supra*; Docket Entry No. 13-1, at 5; (tr. 170). As noted above, the Court is unable

During Dr. Gomez's physical examination, the plaintiff had full range of motion in his shoulders, elbows, and wrists; normal motor strength in his upper extremities; normal fine finger movement and extension; and normal fistmaking, pinch grip, and handgrip. (Tr. 176.) Similarly, when the plaintiff was examined on multiple occasions by Dr. Garside, he demonstrated some tenderness and decreased range of motion in his foot, but there was no indication that his foot injury affected his ability to use his upper extremities. (Tr. 188-91.) In sum, the Court agrees with the ALJ's general conclusion that there is no evidence in the record to support a finding of upper extremity limitations.

Second, the plaintiff argues that the ALJ erred in finding that Dr. Couret's climbing restriction was too restrictive. Docket Entry No. 13-1, at 13. Dr. Couret found that the plaintiff could never climb stairs, ramps, ladders, or scaffolds (tr. 205), but the ALJ observed that the plaintiff "said that climbing was difficult, but not impossible" and limited him to occasional climbing of ramps and stairs but no climbing of ladders, ropes, or scaffolds. (Tr. 70, 73.)

The plaintiff indicated in 2009 that he "cannot climb ladders" (tr. 129), and he testified at the hearing that his knee "stays swollen constantly" and that "[g]etting up and down it bothers [him]. Going up and down the steps, it's unbelievable." (Tr. 24.) Although the ALJ did not provide a citation to the record, it appears that he was referring to this latter testimony when paraphrasing the plaintiff's testimony "that climbing was difficult, but not impossible." (Tr. 73.) In the Court's view, the plaintiff's statements that he cannot climb ladders and that going up and down steps is "unbelievable" does not lead to a conclusion that the plaintiff is able to climb.

---

to reach the same conclusion as the plaintiff because Dr. Couret's handwriting is illegible. Nevertheless, the Court notes that this single treatment note, which predates the plaintiff's alleged onset date by more than a year and a half, addresses the plaintiff's back pain but does not mention any limitations in the plaintiff's upper extremities.

The ALJ could have based his conclusion that Dr. Couret's climbing prohibition was too restrictive on other evidence in the record. For example, DDS medical consultant K. Steinhardt concluded that the plaintiff can frequently climb ramps and stairs and occasionally climb ladders, ropes, and scaffolds. (Tr. 180-81.) Moreover, Dr. Couret himself opined that the plaintiff is able to climb a few steps at a reasonable place with the use of a single hand rail.[14] (Tr. 207.) However, to the extent that the ALJ discredited Dr. Couret's opinion that the plaintiff can never climb based on the plaintiff's testimony, the Court disagrees with the ALJ's conclusion.

The Court is not persuaded, however, that the plaintiff is entitled to remand. First, the ALJ provided for climbing restrictions in the plaintiff's RFC, concluding that he is able to occasionally climb ramps and stairs but never climb ladders. (Tr. 70.) These climbing restrictions are supported by substantial evidence in the record notwithstanding the plaintiff's testimony to the contrary.[15] More importantly, however, the ALJ gave several other good reasons to support his decision to give Dr. Couret's opinion limited weight. (Tr. 73-74.) The ALJ also addressed, for example, the lack of explanation or support for a noise limitation, the lack of support for a sitting limitation, and the lack of support for a left foot limitation in light of the fact that the plaintiff uses his left foot to drive. *Id.* The ALJ also found that a limitation for never stooping was not warranted given the plaintiff's demonstrated ability to do so at the hearing. (Tr. 74.) The ALJ's reasons for giving Dr. Couret's opinion limited weight are, on the whole, supported by the record. While the Court finds that some of the ALJ's explanations are lacking or not supported by the record, the ALJ provided numerous

[14] In the Court's view, Dr. Couret's opinion is internally inconsistent with regard to the plaintiff's ability to climb stairs. (*See* tr. 205, 207.)

[15] As discussed in more detail below, the ALJ found the plaintiff's complaints "only partially credible." (Tr. 73.)

other satisfactory reasons to support his decision. Consequently, the Court concludes that the ALJ did not commit reversible error in evaluating Dr. Couret's opinion.

## 2. The ALJ properly assessed the plaintiff's subjective complaints.

The plaintiff argues that the ALJ "fail[ed] to comply" with Social Security Ruling 96-7p and 20 C.F.R. § 404.1529 when evaluating the plaintiff's subjective complaints of pain. Docket Entry No. 13-1, at 15-17.

An ALJ is charged with evaluating the credibility of the plaintiff at the hearing, and the ultimate decision of credibility rests with the ALJ. The ALJ's credibility finding is entitled to deference "because of the ALJ's unique opportunity to observe the claimant and judge [his] subjective complaints." *See Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (internal citations omitted). However, "[i]f the ALJ rejects the claimant's complaints as incredible, he must clearly state his reason for doing so." *Wines v. Comm'r of Soc. Sec.*, 268 F. Supp. 2d 954, 958 (N.D. Ohio 2003) (citing *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994)).

Social Security Ruling 96-7p emphasizes that credibility determinations must find support in the record, and not be based upon the "intangible or intuitive notion[s]" of the ALJ. 1996 WL 374186, at *4. In assessing the plaintiff's credibility, the ALJ must consider the record as a whole, including the plaintiff's complaints, lab findings, information provided by treating physicians, and other relevant evidence. *Id.* at *5. Consistency between the plaintiff's subjective complaints and the record evidence "tends to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should have the opposite effect." *Kalmbach v. Comm'r of Soc. Sec.*, 2011 WL 63602, at *11 (6th Cir. Jan. 7, 2011). The ALJ must explain his credibility determination such

that both the plaintiff and subsequent reviewers will know the weight given to the plaintiff's statements and the reason for that weight. Soc. Sec. Rul. 96-7p, 1996 WL 374186, at *4.

Both the SSA and the Sixth Circuit have enunciated guidelines for use in analyzing a plaintiff's subjective complaints of pain. *See* 20 C.F.R. §§ 404.1529; 416.929; *Felisky*, 35 F.3d at 1037. While the inquiry into subjective complaints of pain must begin with the objective medical record, it does not end there. The Sixth Circuit, in *Duncan v. Secretary of Health and Human Services*, 801 F.2d 847 (6th Cir. 1986), set forth the basic standard for evaluating such claims.[16] The *Duncan* test has two prongs. The first prong is whether there is objective medical evidence of an underlying medical condition. *Felisky*, 35 F.3d at 1039 (quoting *Duncan*, 801 F.2d at 853). The second prong has two parts: "(1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain." *Id.* This test does not require objective evidence of the pain itself. *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3rd Cir. 1984)).

The ALJ satisfied the first prong of the *Duncan* test when he concluded that the plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms. (Tr. 74.) Given that the second prong of the *Duncan* test consists of two alternatives, the plaintiff must only meet one of the following two elements: the objective medical evidence "confirms the severity of the alleged pain arising from the condition" or the "objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged

---

[16] Although *Duncan* only applied to determinations made prior to 1987, the Sixth Circuit has since held that *Duncan* continues to apply to determinations made after 1987. *See Felisky*, 35 F.3d at 1039 n.2.

disabling pain." The SSA provides a checklist of factors to assess symptoms, including pain, in 20 C.F.R. § 404.1529(c). The ALJ cannot ignore a plaintiff's statements detailing the symptoms, persistence, or intensity of his pain simply because current objective medical evidence does not fully corroborate the plaintiff's statements. 20 C.F.R. § 404.1529(c)(2). Besides reviewing medical records to address the credibility of a plaintiff's symptoms of pain, an ALJ must review the entire case record in light of the seven factors set forth in 20 C.F.R. § 404.1529(c)(3).[17]

The plaintiff argues that the ALJ's credibility determination "hinged upon" his conclusion that Dr. Gomez's examination of the plaintiff's right knee and foot "suggest[ed] that the [plaintiff's] allegations of pain and limitation [were] perhaps exaggerated." Docket Entry No. 13-1, at 15; (tr. 73). The plaintiff points out that Dr. Gomez did not find that he was exaggerating his symptoms. Docket Entry No. 13-1, at 16.

The plaintiff is correct that Dr. Gomez did not find that he was exaggerating his symptoms; however, the ALJ did not attribute this finding to Dr. Gomez. Rather, this was the ALJ's own conclusion based upon inconsistencies between the plaintiff's complaints of disabling symptoms and Dr. Gomez's examination. (Tr. 73.) For example, while the plaintiff complained of "severe . . . constant" pain in his right knee, he had only mild edema and moderate tenderness with normal extension and flexion at 120 degrees. (Tr. 175-76.) The plaintiff made similar complaints about his

_____

[17] The seven factors include: (i) the plaintiff's daily activities; (ii) the location, duration, frequency, and intensity of the plaintiff's pain or other symptoms; (iii) precipitating and aggravating factors; (iv) the type, dosage, effectiveness and side effects of any medication the plaintiff takes or has taken to alleviate pain or other symptoms; (v) treatment, other than medication, plaintiff received or has received for relief of pain or other symptoms; (vi) any measures plaintiff uses or has used to relieve pain or other symptoms (e.g. lying flat on his back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and (vii) other factors concerning the plaintiff's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3).

right foot, but he had only moderate tenderness to palpation with no edema.  *Id.*  He had full motor strength and 2+ reflexes in his upper and lower extremities as well as full range of motion in his shoulders, elbows, wrists, hips, and lumbosacral spine.  (Tr. 176.)  He was able to do straight leg raises in the lying and sitting position, stand on one leg normally, and do the tandem and heel walks, although he was unable to walk on his toes or perform a squat.  *Id.*

The ALJ concluded that the plaintiff's complaints were inconsistent with Dr. Gomez's physical findings.  It was within the ALJ's purview to reach this conclusion as it was the ALJ's responsibility, and not Dr. Gomez's, to make a credibility determination.  *See* SSR 96-7p, 1996 WL 374186, at *4.  Social Security Ruling 96-7p provides that an ALJ must consider inconsistencies between a plaintiff's reported symptoms and other evidence in the record such as "reports from . . . examining physicians."  *Id.* at 5-6.  The ALJ appropriately concluded that inconsistencies between the plaintiff's reported symptoms and his presentation to Dr. Gomez rendered him less credible.

Moreover, the ALJ found other reasons for finding the plaintiff's subjective reports  "only partially credible."  (Tr. 73.)  The ALJ observed that, when the plaintiff returned to Dr. Garside for treatment in 2006 and 2009, each instance was after a several year absence and concluded that the plaintiff's "failure to seek treatment during that period suggest[ed] relative freedom from symptoms."  (Tr. 72.)  Similarly, the ALJ noted that the plaintiff failed to obtain custom orthotics, which Dr. Garside prescribed to him on multiple occasions.  *Id.*  The ALJ set forth a detailed analysis evaluating several factors in 20 C.F.R. § 404.1529(c)(3) and concluding that the plaintiff's subjective complaints of pain were not disabling.  (Tr. 71-74.)  The ALJ's assessment complies with *Duncan*, Social Security Ruling 96-7p, and 20 C.F.R. § 404.1529.

**3. The ALJ did not err by determining that the plaintiff has the RFC to perform light work.**

The plaintiff argues that the ALJ erred in determining that he has the RFC to perform light work. Docket Entry No. 13-1, at 15. Specifically, the plaintiff contends that the ALJ based the plaintiff's RFC in part on Dr. Couret's opinion and in part on Dr. Gomez's opinion but that neither opinion provides for a full workday of eight hours. *Id.*

First, as discussed above, the ALJ only gave Dr. Couret's opinion limited weight. (Tr. 73-74.) The ALJ was not required to include limitations in the plaintiff's RFC that were not supported by the record or that he found not credible. *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993). The ALJ included some of Dr. Couret's limitations, for example a sit/stand option and limitations on the use of the right lower extremity, in the plaintiff's RFC. (Tr. 70, 73-74.) However, because the ALJ found that other limitations were not supported by the record or were otherwise not credible, he appropriately excluded them.

The plaintiff also argues that Dr. Gomez's conclusion that he can "stand or sit at least six hours in an eight-hour workday with normal breaks" excludes an eight-hour workday because it provides for a combined total of only six hours of work. Docket Entry No. 13-1, at 15. Again, however, the plaintiff's argument is flawed because, although the ALJ gave Dr. Gomez's opinion "significant weight," the ALJ did not give Dr. Gomez's opinion controlling weight or otherwise adopt the opinion. It was the ALJ's role, not Dr. Gomez's, to determine the plaintiff's RFC, and the ALJ determined that the plaintiff was capable of working an eight-hour workday.

## IV. RECOMMENDATION

For the above stated reasons it is recommended that the plaintiff's motion for judgment on the record (Docket Entry No. 13) be DENIED and that the Commissioner's decision be affirmed.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation, and must state with particularity the specific portions of this Report and Recommendation to which the objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's Order regarding the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully Submitted,


JULIET GRIFFIN
United States Magistrate Judge